# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 29, 2014

## REGINALD MAURICE ADKINS v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No. 2008-A-88   Cheryl Blackburn, Judge

### No. M2013-02481-CCA-R3-PC - Filed October 31, 2014

The Petitioner, Reginald Maurice Adkins,[1] appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2010 convictions for first degree murder and attempted especially aggravated robbery and his life-plus-twelve-years sentence. The Petitioner contends that he received the ineffective assistance of counsel and that the post-conviction court erred by denying him relief. We affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Kara Everett, Nashville, Tennessee, for the appellant, Reginald Maurice Adkins.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Glenn Funk, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] We note that although the caption on the Petitioner's pro se petition for relief shows Reginald Maurice Adkins, he signed the petition Reginald Atkins. At the post-conviction hearing, the Petitioner testified that his name was Atkins. The remainder of the appellate record shows the Petitioner's name as Reginald Adkins. We use Adkins and imply no disrespect to the Petitioner.

# OPINION

This case arises from the Petitioner and his two codefendants' killing Jared Collins. The Petitioner appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

On November 6, 2007, Jared Collins ("the victim"), a white male, was shot and killed outside a market located at 839 Dickerson Pike in Nashville. In January 2008, a Davidson County grand jury returned a two-count indictment relating to the victim's death, charging that the Defendant, Brandy Lea Birdwell, and Darryl Dekezz Thompson committed the offenses of first degree felony murder and especially aggravated robbery. The Defendant's trial, which was severed from that of his co-defendants, was conducted on January 11-13, 2010.

Annthonett Bethea testified that, on November 6, 2007, she waited in her car while her son went into the market on Dickerson Pike. Ms. Bethea saw a white male get out of his vehicle and have a brief conversation with two black men, approximately between the ages of seventeen and nineteen, who had approached from the alley between the market and the liquor store. She said that the white male walked toward the liquor store and that the shorter of the two black men also proceeded toward the liquor store. Ms. Bethea recalled that the taller black male went to the white male's car, opened the driver's door, and began searching for something. She said that the white man then came back from the liquor store and saw the black man in his car.

At this point, all three men converged and had a conversation, although Ms. Bethea could not hear what they said. However, she witnessed one of the black men hold one side of the white man, while the other black man patted his body as if he was looking for something. She testified that she thought it was the shorter black male that was more aggressively touching the white man. She recalled that, when her son opened the door to get back in the car, she heard one of the black men say, "[G]ive me the damn money." Ms. Bethea also testified that she then saw that the shorter black man had a gun. She testified that she started moving her vehicle at that time because she was afraid.

After she drove out of sight of the altercation, she heard a gunshot. Ms. Bethea testified that, as she drove around the store, she then saw the two black males jump into the bed of a white pickup truck. She recalled that she had

seen the pickup truck parked on the side of the market when she arrived. Ms. Bethea stated that she saw a white female driving the pickup truck and that the vehicle left the parking lot very quickly. Ms. Bethea testified that she went back to the front of the store to see what happened to the white male. She went into the market and saw that he had been shot in his lower back.

Tearra Mayfield testified that, on November 6, 2007, she went to the market at 839 Dickerson Pike with the Defendant, Darrell Thompson, and Brandy Birdwell. Ms. Mayfield said that the Defendant is her stepbrother and that they lived in the same household. She stated that the foursome, whom had been together since about 1:00 p.m. that day, went to the market in Ms. Birdwell's white pickup truck and that she sat in the front passenger seat while the Defendant and Mr. Thompson sat in the fold-out seats in the extended cab. Ms. Mayfield testified that she saw the Defendant with a black revolver in his pocket that day. She recalled that she heard the Defendant and Mr. Thompson say that they were broke and needed some money. She said that they were "talking foolishness" and that she assumed they were going to get money by robbing someone.

Before heading to the market, Ms. Mayfield, the Defendant, Mr. Thompson, and Ms. Birdwell were at Ms. Mayfield's grandmother's house, located on Pennock Avenue. According to Ms. Mayfield, the Defendant and Mr. Thompson saw some people, one of whom was the victim, leave from across the street. Ms. Mayfield said that the four of them then left to go to the market. She recalled that Ms. Birdwell parked on the side of the market and the Defendant and Mr. Thompson got out of the truck. Although Ms. Mayfield could not see what happened, she heard "some tussling" and then a gunshot. Afterward, the Defendant and Mr. Thompson got into the bed of the pickup truck and yelled at Ms. Birdwell to leave the parking lot. The sliding back window between the cab and the bed was open, and Ms. Mayfield heard the Defendant and Mr. Thompson laughing and giggling. Then, she heard the Defendant say, "[D]id you see what I did to the n[-----]." When the group got to Cedar Hill Park, Ms. Mayfield saw the gun again, still in the Defendant's possession.

Christy Dean testified that she was with the victim on November 6, 2007, shortly before he was shot and killed. She recalled that the victim came over to her house on Pennock Avenue to visit with her then-fiancé and that the victim said he was going to go to the market. Ms. Dean accompanied the victim and went to a flooring store near the market.

As Ms. Dean returned from the flooring store, she saw that the victim was out of his vehicle and was scuffling with two black men, who were between the approximate ages of nineteen and twenty-five years old. She said that the victim had one hand in his pocket and was fighting them with one hand. She testified that the two men kept hitting the victim but that eventually he was able to run toward the market. She testified that, when the victim opened up the door to the market, he was shot in the back. Although she did not see the shooter's face, Ms. Dean testified that the shorter black man fired the shot.

Ms. Dean stated that she witnessed a white truck approach from the side of the store and that the two guys jumped into the bed of the truck. She testified that the driver of the truck was a white female that she recognized as someone who had visited Ms. Dean's neighbor's house before. Ms. Dean also said that she identified the driver of the white truck in a photo lineup.

On cross-examination, Ms. Dean admitted that she had bought prescription drugs from her neighbor, Ms. Mayfield's grandmother. She also acknowledged that the victim was addicted to pills.

Officer Po Cheng, employed by the Metropolitan Nashville Police Department, testified that, as he was responding to another call around 4:30 p.m. on October 6, 2007, he drove by the market at 839 Dickerson Pike and was flagged down by a large group of people, who told him that someone had been shot. Officer Cheng said that he went inside the market and located the victim, whom he described was "in bad shape." He recalled that the victim was making some gurgling noises and was not able to respond to questions.

Detective Paul Harris, of the Metropolitan Nashville Police Department, testified that he investigated the [victim's] homicide. Detective Harris recalled that, as a result of Ms. Dean's identification of the driver of the pickup truck, he obtained a search warrant for Ms. Birdwell's residence. As a result of the search, he obtained a Colt revolver. Detective Harris stated that the revolver was loaded with six live rounds. He testified that he also recovered a .38 caliber shell casing and an unfired round from Ms. Birdwell's bedroom.

Detective Harris stated that he interviewed the Defendant on November 13, 2007, and that the Defendant signed a *Miranda* waiver form. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). Detective Harris recalled his conversation with the Defendant as follows:

He indicated that he rode in the bed of [Ms.] Birdwell's truck with [Mr.] Thompson, which is a person he refers to as D throughout the interview, and [Ms.] Birdwell and [Ms.] Mayfield. He indicated that the four of them had been at a home on Pennock Avenue and they had been drinking and smoking weed and taking Ecstasy that day. And he indicated that the three of them, meaning the three other than him, [Ms. Birdwell], [Ms. Mayfield] and [Mr. Thompson], must have come up with some plan to rob that he wasn't aware of. And he was seated on [Ms.] Birdwell's pickup truck on the tailgate in the bed of it. He wasn't clear. But he was outside the truck, either on the tailgate or in the bed. And [Ms. Birdwell] got in the truck and started driving, following the victim. And [Mr. Thompson] got in the bed of the truck with him and [Ms. Mayfield] got in the front seat and they went to the market.

[Ms. Birdwell] parked on the north side of the market, as opposed to the front of the market. And they got out of the truck, meaning he and [Mr. Thompson] . . . got out of the truck. And he indicated in his interview that it was his intention to go to the store, but he did not ever get inside the store. Instead [Mr. Thompson] started talking to the victim. He claimed he wasn't privy to what they were speaking about. He didn't know what they were talking about. But, nonetheless, they spoke. And then the victim walked away.

Then [Mr. Thompson] went to the victim's—I believe it's a Toyota [F]our-[R]unner that was parked outside the market, as well, and [Mr. Thompson] started going through the victim's truck. He opened the driver's side door and [the Defendant] indicated he stayed on the side of the truck. And [Mr. Thompson] indicated something to the effect of, come on, man, let's—I forget his exact quote—come on—he was encouraging him to some degree, come on, let's get this, let's do this, something along those lines. I forget his exact wording.
And the victim soon thereafter came outside and saw [Mr. Thompson] going through the victim's truck. The victim then confronted [Mr. Thompson] and they got into a physical scuffle, an altercation, about having seen him going through his truck, his own property. He indicated that [Mr. Thompson] and

the victim scuffled and [Mr. Thompson] was trying to go through his pockets. This is what [the Defendant] is telling me in the interview. That [Mr. Thompson] was trying to go through his pockets. And then he indicated the gun that [Mr. Thompson] was carrying fell to the ground. And then he said [Mr. Thompson] picked it up.

. . . He indicated it was [Mr. Thompson] that possessed the weapon.

Detective Harris also testified that the Defendant told him the gun was Ms. Birdwell's and that it was registered to her mother. However, the Defendant acknowledged that his prints might be found on the gun because he had touched it previously.

Regarding the Defendant's height, Detective Harris testified that the Defendant is 5'5", while Mr. Thompson is 5'11". Dr. Adele Lewis, an Assistant Medical Examiner for the State of Tennessee, performed an autopsy on the victim on November 7, 2007. She testified that the victim suffered a gunshot wound to his back and that the bullet fractured the victim's right tenth rib, traveled through part of the victim's right lung, went through his heart, and hit one of the arteries that supplies blood to the heart. She testified that she recovered the bullet from the victim's chest and turned it over to the police. Dr. Lewis testified that the victim's cause of death was a gunshot wound to the torso and that his manner of death was homicide. Dr. Lewis also said that the victim's toxicology report indicated that hydrocodone and methadone were present in his blood.

Felicia Evans, a crime scene investigator with the Metropolitan Nashville Police Department, testified that she arrived at the scene of the shooting at approximately 5:25 p.m. She recalled that she recovered latent fingerprints from the victim's 1998 Toyota Four-Runner, which "was found with the driver door ajar and various items of paper and stuff kind of strewn about." Ms. Evans stated that she also processed a white 1999 Ford Ranger pickup truck that belonged to either Ms. Birdwell or her mother. In the Ford Ranger, she found a black purse with two cartridge casings inside, a cartridge casing in a compartment on the rear driver's side door, and two .38 caliber cartridge casings in the center console.

-6-

Special Agent Shelly Betts, employed by the Tennessee Bureau of Investigation, testified she examined the bullet recovered from the victim's chest and determined that it had been fired from the Colt revolver recovered at Ms. Birdwell's house.

Belinda Shea, a latent print examiner for the Metropolitan Nashville Police Department, testified that she examined the fingerprints collected from the victim's automobile and matched Mr. Thompson's fingerprints to the ones recovered from the outside of the driver's door. Ms. Shea stated that she matched fingerprints from the Defendant, Ms. Birdwell, Mr. Thompson, and Ms. Mayfield to latent prints recovered from Ms. Birdwell's white pickup truck. She also said that she examined the prints from the weapon recovered from Ms. Birdwell's home but that the prints could not be identified due to a lack of ridge detail.

Tewodros Tashu, a clerk at the market where the victim was shot, testified that, around 4:30 p.m. on November 6, 2007, he looked outside and saw three people—two black and one white—struggling. He was not sure whether they were fighting or playing, so he started to go outside to get a better look. He described what he saw when he opened the door: "I see that it was a serious fight. And one of them tried to come into the store. So I opened the door for him when I realized that it was a serious fight, somebody was trying to hurt someone." Mr. Tashu testified that, when he opened the door, the victim started to come into the store. At that point, Mr. Tashu heard gunfire and saw the other two men run toward the side of the building. Mr. Tashu took the victim back into his office, at which time the victim said, "[C]all the police, this is the only money I have. Please help me, help me, this is the only money I have. Please call the police."

The Defendant, twenty-one years old at the time of the trial, testified that, on November 6, 2007, he "was on weed, drinking alcohol heavily and popping Ecstasy." He described that he "was real drunk" and "blank[ed] in and out." The Defendant stated that he, Mr. Thompson, Ms. Birdwell, and Ms. Mayfield went to the market to get orange juice to mix with vodka. He recalled that they saw the victim, whom he claimed owed Mr. Thompson money for drugs, and that Mr. Thompson wanted to talk to the victim. He recalled the victim said he did not have any money and Mr. Thompson went into his vehicle and "told him he was going to take something for collateral until he get his money." The Defendant stated that, when the victim came back and saw Mr. Thompson in his car, they got into an altercation. The

Defendant testified that he did not touch the victim. According to the Defendant, Mr. Thompson had the gun and shot the victim.

The jury found the Defendant guilty of first degree felony murder and attempted especially aggravated robbery. The trial court sentenced him to consecutive terms of life imprisonment for his first degree felony murder conviction and twelve years, as a Range I offender, for his attempted especially aggravated robbery conviction[.]

*State v. Reginald Maurice Adkins*, No. M2010-00694-CCA-R3-CD, slip op. at 1-7 (Tenn. Crim. App. Mar. 11, 2011).

The Petitioner filed a pro se petition for post-conviction relief alleging prosecutorial and judicial misconduct and the ineffective assistance of counsel. After the finding of a colorable claim by the post-conviction court, counsel was appointed and an amended petition was filed, alleging insufficient evidence existed to support his convictions.

At the post-conviction hearing, trial counsel testified that he was appointed to represent the Petitioner in 2008 or 2009. He agreed multiple "discussion dates" were scheduled before setting the trial date. He could not remember the number of times he met with the Petitioner but said his investigator usually met more frequently with his clients until close to trial. The investigator, Pat Wells, usually conducted the initial interview and would have interviewed the witnesses listed in the indictment. Witnesses named in the police reports and those identified by a defendant were also interviewed. Counsel's usual practice was to visit with a client more frequently as the trial date approached. He assumed he followed his usual practice in this case.

Trial counsel testified that he met with the Petitioner at the jail and at the courthouse when discussion dates were scheduled. Counsel and the Petitioner discussed the case, the possible sentences, the State's evidence, the State's plea offer, and possible defenses. The State's plea offer included the Petitioner's pleading guilty to second degree murder outside his offender range for a forty-year sentence at 100% service. He conveyed the offer to the Petitioner, which he thought was at the final discussion date before the case was scheduled for trial. He told the Petitioner that he faced a possible life sentence for felony murder and fifteen to twenty-five years for especially aggravated robbery and that the trial court could order consecutive service if it found that the Petitioner was a dangerous offender. Counsel noted the court ordered consecutive service.

Trial counsel testified that the Petitioner understood the elements of the offenses with which he was charged because the Petitioner was adamant that he did not "go there" to rob anyone. The Petitioner claimed he was assisting his codefendant collect a drug debt. Counsel recalled the Petitioner and his codefendants had smoked marijuana and had drunk alcohol on the day of the killing. He said his usual practice was to ask the medical examiner on cross-examination about the effects of drugs and alcohol. He agreed he did not seek an expert to testify about the effects of marijuana and alcohol on the Petitioner. Counsel noted that the problem with an "I was so messed up I didn't know what I was doing" defense was the evidence showed the Petitioner fled after the shooting. Counsel thought that although the Petitioner might have been "high," the Petitioner knew what he was doing and attempted "to cover his tracks" after the shooting. He said who possessed the gun or who drove the truck was irrelevant because the State argued all of the parties were criminally responsible. He believed the Petitioner clearly understood this point.

Trial counsel testified that he interviewed John Spencer, a witness who told the police that he saw the robbery or the shooting while it was occurring and that the taller of the two black men held the gun. Counsel noted the taller man would have been the Petitioner's codefendant. He said Mr. Spencer "completely backed up from what he . . . originally said." Mr. Spencer admitted making the statement about the two black men, but after reflecting on the events, he was not sure what he saw. Counsel noted again that under the State's theory, it did not matter who held the gun.

Trial counsel testified that the majority of the State's case relied upon eyewitness testimony. Although he could not recall everyone who testified, he knew the store owner and a female customer testified. He said one of the Petitioner's codefendants also testified for the State. Counsel said his investigator interviewed the eyewitnesses who testified at the trial and compiled a summary of the interviews. He noted the interviews were also audio recorded. Counsel did not obtain an eyewitness identification expert because both a codefendant who testified against the Petitioner and the independent witness were of the same race as the Petitioner. This eliminated any cross-racial misidentification concerns. He noted the police told him that the female witness did not appear stressed after the robbery or when she identified the Petitioner.

Trial counsel testified that he first spoke to the Petitioner about testifying at the trial during one of the pretrial discussions. He said the Petitioner wanted to testify because he wanted to tell the jury that he did not go to the store to rob anyone. Counsel told the Petitioner that he would be subject to cross-examination. He said it was the Petitioner's decision whether to testify, and counsel noted that the Petitioner was the only witness who could testify that the Petitioner did not intend to rob anyone. He denied coercing the Petitioner into testifying.

Trial counsel testified that given the witness testimony at the trial, the only possible defense was that the Petitioner did not intend to commit a robbery. He hoped the jury would believe the Petitioner and find him not guilty of felony murder. He said he discussed this trial strategy with the Petitioner. The Petitioner told counsel that codefendant Thompson was "beaten out of this money and knew where [the victim] was going to be" that night. The Petitioner agreed to go with his friend to help collect the money. Counsel explained the elements of especially aggravated robbery and the concept of criminal responsibility, but the Petitioner did not care because he did not have the gun.

Trial counsel testified that codefendant Birdwell told the police that after the shooting, she heard the Petitioner and codefendant Thompson "bragging about what they had just done" to the victim. Counsel thought the case never should have gone to trial and said he attempted to express that opinion to the Petitioner. He said, though, convincing someone as young as the Petitioner to accept forty years' confinement at 100% service was almost impossible.

Trial counsel testified that he appealed the Petitioner's convictions. He said that he did not raise an issue regarding consecutive sentences because the trial court properly followed *Wilkerson* after finding that the Petitioner was a dangerous offender. Counsel believed raising the issue would have been "borderline frivolous." He did not recall the prosecutor making any improper statements during his closing argument.

On cross-examination, trial counsel testified that in the Petitioner's police statement, he placed himself at the scene and that the Petitioner did not mention collecting a drug debt. He agreed Ms. Mayfield was the only witness who identified the Petitioner by name. Regarding the Petitioner's testifying at the trial, counsel said the Petitioner had to testify in order to present evidence of the Petitioner's intoxication and debt collection intention.

Upon questioning by the post-conviction court, trial counsel testified that the State tried a codefendant first and that he had reviewed the transcript from that trial before the Petitioner's trial began. The court noted this court's opinion in which it stated that Ms. Mayfield testified that the Petitioner and a codefendant were laughing after the shooting and that the Petitioner said, "[D]id you see what I did[?]" Regarding the appeal, counsel thought he raised sufficiency of the evidence in the context of the State's failure to show the Petitioner's mental state at the time of the shooting.

The Petitioner testified that trial counsel never visited him at the jail before the trial. He said a woman from counsel's firm visited him but denied Mr. Wells visited him. He said he spoke to counsel about the charges at a court discussion date close to the trial. He said that the meeting was brief and that they discussed "how much time they offered and what

-10-

should [he] take." He denied discussing with counsel his right to testify or about the benefits and pitfalls of his testifying. He denied discussing with counsel the State's witnesses' potential trial testimony, the elements of the offenses with which he was charged, the State's evidence, or the discovery materials. The Petitioner said they discussed "in the weeks before the trial" his mental state at the time of the shooting, but he could not recall what he told counsel. He denied talking about what was "on [his] mind" at the time of the shooting.

The Petitioner testified that he and trial counsel discussed the Petitioner's intent at the time of the shooting. He told counsel, "[W]e had went to the store to get some orange juice and my codefendant, Darryl Thompson, had seen somebody that owed him some money. So I assisted him to . . . collect a debt." The Petitioner, though, also stated that he and counsel never discussed his intent. He denied knowing the defense theory before the trial. Regarding his testifying at the trial, the Petitioner said counsel told him that the Petitioner would be "getting on the stand." He denied knowing he had a choice of whether to testify.

The Petitioner testified that he did not provide trial counsel or his staff with names of potential witnesses because he did not meet with anyone to discuss them. He denied understanding before the trial the charges against him, the available defenses, the State's evidence against him, and the elements of the offenses.

On cross-examination, the Petitioner testified that he wanted a trial and trusted his lawyer to win. He agreed he admitted going to the store and having contact with the victim. He denied understanding the concept of criminal responsibility and said the only thing he and trial counsel discussed was the plea offer and "what we're going to court for." He said he went to court for first degree murder and attempted especially aggravated robbery. He could not recall if counsel discussed the State's evidence, how the law applied to the evidence, and the possibility of his being convicted of first degree murder. The Petitioner thought counsel should have called Mr. Spencer as a trial witness. He said he wanted a lot of things in a new trial to be different, including his "defense strategy." When asked how the strategy might be different in a new trial, he said he did not "forcefully collect" the money from the victim. He denied knowing what codefendant Thompson was going to do and claimed codefendant Thompson only said "collect money."

The Petitioner testified that although he did not want to testify at the first trial, he would testify at a new trial. He stated that he never said he was never going to testify at the trial. He said moments later that he wanted to testify at the original trial, although trial counsel coerced him into testifying. When asked to clarify if he wanted or did not want to testify, the Petitioner would not answer the question.

-11-

Upon questioning by the post-conviction court, the Petitioner testified that he recalled signing a document stating he wanted a trial and rejected the State's plea offer. He agreed trial counsel talked to him about the State's offer. When asked about the substance of his testimony at a new trial, he said, "I ain't have no intention of robbing one bit." He admitted, though, he testified previously that he did not have any intent to rob the victim. He denied understanding the legal concepts discussed during opening statements and closing arguments and said he did not ask counsel to explain them.

The Petitioner testified that in addition to Mr. Spencer, he wanted trial counsel to call codefendant Birdwell as a trial witness. The post-conviction court explained that it was not permissible, and the Petitioner denied knowing he could not call her as a trial witness. He denied wanting to call any other witnesses at the trial.

In a written order, the post-conviction court found that although the Petitioner initially admitted discussing the offenses near the trial date, he repeatedly denied ever discussing with trial counsel the offenses, the State's evidence, the potential witnesses, and possible defenses. It noted that on cross-examination, the Petitioner said he could not recall if they discussed these matters. The court discredited the Petitioner's testimony and found that his "blanket denials" were "incredulous."

The post-conviction court credited trial counsel's testimony and found that counsel and the Petitioner met at the courthouse to discuss the case, possible sentences, the State's evidence, the plea offer, and possible defenses. The court found that counsel's investigator, Mr. Wells, spoke with the Petitioner and potential witnesses and that recordings of his interviews were provided to counsel. The court found that the Petitioner's version of events regarding the debt was different from his initial statement to the police and that as a result, counsel concluded that the Petitioner's testifying was the only way the jury would hear about the debt. The court found that counsel and the Petitioner discussed the benefits and pitfalls of testifying based on the Petitioner's stating that although he was present at the shooting, he was only there to help a friend collect a debt. The court found that no evidence showed counsel failed to investigate the case, failed to meet with the Petitioner, and failed to keep the Petitioner informed.

Regarding the Petitioner's claim that trial counsel failed to interview and investigate properly and to present witnesses who were present during the offense, including Tearra Mayfield and Christy Dean, the post-conviction court found that no evidence was presented at the post-conviction hearing regarding Ms. Mayfield and Ms. Dean. The court found that the Petitioner wanted Mr. Spencer called as a trial witness and that counsel interviewed Mr. Spencer. The court found that Mr. Spencer could only testify regarding the height of two black men but later questioned the accuracy of what he saw. The court found that counsel

investigated potential witnesses with the aid of Mr. Wells and that counsel had the transcript from codefendant Birdwell's trial. As a result, the court found that counsel had "an overview" of the State's case. The court noted the Petitioner failed to present any potential witnesses at the post-conviction hearing.

Regarding the Petitioner's claim that trial counsel failed to advise him properly about his right to testify, the post-conviction court credited counsel's testimony that the Petitioner rejected the State's plea offer and that the Petitioner's desired defense involved his testifying at the trial because he failed to tell the police he had no intention of robbing the victim. The court found that although the chosen defense involved the Petitioner's testifying at the trial, counsel "cautioned" the Petitioner against testifying but left the decision to the Petitioner. The court found that the Petitioner chose to testify at the trial, although the Petitioner initially testified that counsel did not discuss the decision with him or explain that the Petitioner had a choice. The court noted that the Petitioner's stating at the evidentiary hearing that he wanted to testify at a new trial "undercut[] his coercion allegation."

Regarding the Petitioner's claim that trial counsel failed to investigate and evaluate the need for expert witnesses in the fields of toxicology and eyewitness identification, the post-conviction court found that the Petitioner was not questioned about the need for experts. The court found, however, that counsel knew of the Petitioner's consumption of alcohol and drugs and asked the medical examiner at the trial about their effects. The court also found that although the Petitioner might have been "high," the trial evidence showed that he was not so intoxicated that he did not know what he was doing at the time of the shooting. Regarding an eyewitness expert, the court found that the witnesses were only able to provide general descriptions of the perpetrators, that cross-racial identification was not an issue because the Petitioner and the primary eyewitness were the same race, and that codefendant Birdwell corroborated the Petitioner's identity. The court noted that the Petitioner failed to present any experts as witnesses at the post-conviction hearing.

The Petitioner alleged in his petition that trial counsel improperly argued that the attempt to collect the debt was not a theft. The post-conviction court found that counsel testified that the only viable defense was for the Petitioner to convince the jury that he did not intend to rob the victim because the Petitioner was adamant he did not intend to commit a robbery. The court found that the Petitioner testified at the post-conviction hearing that he went to the store to help his friend collect a debt and did not realize the friend intended to rob the victim. The court found that the Petitioner's post-conviction testimony supported counsel's legal arguments at the trial.

-13-

Regarding the Petitioner's claim that trial counsel failed to object to improper statements during the prosecutor's closing argument and failed to raise that issue on appeal, the post-conviction court found that the Petitioner did not present evidence of any specific instance of misconduct. Regarding counsel's failure to raise the issue of consecutive sentences on appeal, the court credited counsel's testimony that the trial court complied with the *Wilkerson* requirements and the applicable sentencing statute. The court's order denied relief. This appeal followed.

The Petitioner contends that the post-conviction court erred by concluding that trial counsel provided effective assistance of counsel. He argues counsel was ineffective by failing to meet with him adequately, failing to discuss with him his right to testify, failing to discuss the substance of the State's witnesses, failing to review the elements of the offenses, and failing to seek the services of experts in the fields of toxicology and eyewitness identification. The State responds that the Petitioner received the effective assistance of counsel. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* at § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered

. . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Regarding trial counsel's failure to meet with the Petitioner adequately and failure to discuss his right to testify at the trial, the substance of the State's witnesses' testimony, and the elements of the offenses with which he was charged, counsel's credited testimony shows that counsel's performance was not deficient and that there was no prejudice to the outcome of the proceedings. The record reflects that counsel met with the Petitioner at the jail and at the courthouse. Counsel and the Petitioner discussed the case, the possible sentences, the State's evidence, the State's plea offer, and possible defenses. Although the Petitioner rejected the State's plea offer, counsel told the Petitioner that he faced a possible life sentence for felony murder and fifteen to twenty-five years for especially aggravated robbery and that the trial court might order consecutive service after finding that the Petitioner was a dangerous offender. We note the court ordered consecutive service. Counsel thought the case never should have gone to trial, and he attempted to express his opinion to the Petitioner. Counsel said, though, it was almost impossible to convince someone as young as the Petitioner to accept forty-years' confinement at 100% service.

Further, trial counsel explained to the Petitioner the elements of the offenses. Counsel believed the Petitioner understood the elements of the offenses because the Petitioner insisted he tell the jury that he did not intend to rob the victim, only to help a friend collect a debt. Counsel explained to the Petitioner the State's theory of criminal responsibility for the conduct of another and the irrelevance of who held the gun during the shooting. Counsel believed the Petitioner understood the State's theory, but the Petitioner did not care because he was not holding the gun. The Petitioner is not entitled to relief on this basis.

Regarding trial counsel's failure to discuss the Petitioner's right to testify at the trial, counsel first spoke to the Petitioner about testifying at the trial during one of the pretrial discussions. Counsel said the Petitioner wanted to testify because he wanted to tell the jury that he did not go to the store to rob anyone. Counsel told the Petitioner that he would be subject to cross-examination and cautioned the Petitioner about testifying but said it was the Petitioner's decision. Counsel denied coercing the Petitioner into testifying. We note the Petitioner's contradictory post-conviction testimony about whether he wanted to testify and his refusal to clarify his testimony on cross-examination. In any event, the Petitioner said that he wanted to testify at a new trial to establish that he did not intend to rob the victim. The record reflects, though, that the Petitioner testified at the trial that he did not intend to rob the victim, and he agreed with the post-conviction court that he testified accordingly at the trial. Counsel noted that given the witness testimony and the Petitioner's contentions that he was not holding the gun and only helping to collect a debt, the only possible defense was the Petitioner did not intend to commit a robbery. Counsel concluded that the Petitioner was the only witness who could testify regarding his intent because the Petitioner failed to mention the debt collection during his police interview. Counsel said he discussed this trial strategy with the Petitioner. Counsel did not provide deficient performance or prejudice the outcome of the trial, and the Petitioner is not entitled to relief on this basis.

Regarding trial counsel's failure to seek the services of experts in the fields of toxicology and eyewitness identification, the record reflects that counsel's performance was not deficient and that there was no prejudice to the outcome of the trial. Regarding the need for a toxicology expert, counsel testified that he knew the Petitioner drank alcohol and used drugs on the day of the shooting but chose not to present expert testimony regarding the effects of the drugs and alcohol. Counsel, pursuant to his usual practice, questioned the medical examiner at the trial about the effects and received favorable responses. Counsel said that although the Petitioner might have been under the influence of drugs and alcohol, the Petitioner knew what he was doing and attempted to "cover his tracks" after the shooting. Counsel noted that the problem with an "I'm so messed up I didn't know what I was doing" defense was the evidence showed the Petitioner fled the scene after the shooting. The proof at the trial supported counsel's conclusion. The trial evidence showed that after the shooting, Ms. Bethea saw the Petitioner and codefendant Thompson "jump into" codefendant Birdwell's truck, which left the store parking lot "very quickly." Ms. Mayfield testified that after the shooting, the Petitioner and codefendant Thompson entered the truck and yelled for codefendant Birdwell to leave the parking lot. Ms. Mayfield also heard the Petitioner laugh and say, "[D]id you see what I did[?]" Likewise, the store clerk testified that he saw two men run toward the side of the building after the shooting. We note that although the Petitioner told the police about his alcohol consumption and drug use, the Petitioner did not mention that he was intoxicated or impaired at the time of the shooting. The Petitioner is not entitled to relief on this basis.

Regarding the need for an eyewitness expert, trial counsel did not obtain a witness identification expert because Ms. Mayfield, the Petitioner's stepsister, was with the Petitioner and his codefendants on the day of the shooting. Ms. Mayfield testified that she saw the Petitioner with the gun earlier that day and that she heard the Petitioner and codefendant Thompson discuss robbing someone because they needed money. Although Ms. Mayfield was not charged with a crime, she heard a struggle and a single gunshot. After the shooting, Ms. Mayfield heard the Petitioner and codefendant Thompson laughing and the Petitioner ask, "[D]id you see what I did[?]" Ms. Mayfield knew the Petitioner and clearly identified him as a participant in the shooting. Likewise, counsel did not believe an expert was necessary because the remaining witnesses who testified at the trial were the same race as the Petitioner and only identified the Petitioner and codefendant Thompson as two black men distinguished by their height. The trial proof showed that the Petitioner was about 5'5", that codefendant Thompson was about 5'11", that Ms. Bethea saw the short black man with a gun, and that Ms. Dean saw the short black man shoot the victim. Counsel was told the female witness did not appear stressed at the time of her police interview. Counsel concluded that any cross-racial misidentification concerns were eliminated.

We note that post-conviction counsel did not present any expert testimony regarding eyewitness misidentification. This court has concluded that when a petitioner claims counsel was ineffective by failing to call a witness at a trial, a petitioner generally cannot establish prejudice without presenting that witness at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (concluding that a post-conviction petitioner should produce a material witness "who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called" to establish his claim). The Petitioner is not entitled to relief on this basis.

The judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-17-